**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____
ROMONDA HICKMAN,

                Plaintiff,

     v.

FREEHOLD BOROUGH, GLENN
ROBERTS, JOHN DOES 6-10, and KEVIN
WERNER,

                Defendants.
_____

Civil Action No. 15-3578 (FLW)(LHG)

**OPINION**

**WOLFSON, United States District Judge**:

       Before the Court are the motions of Defendants Kevin Werner and Freehold Borough for summary judgment on the Complaint of Plaintiff Romonda Hickman. In her Complaint, Plaintiff brings claims against Defendant Werner, individually, for excessive force in violation of her Fourth Amendment Rights under 42 U.S.C. § 1983, and for the torts of assault and battery and negligence under the common law of the State of New Jersey, as a result of Defendant Werner's restraint of Plaintiff before her arrest during a domestic violence incident on September 23, 2014. Plaintiff also brings claims against Defendant Freehold Borough for assault and battery and negligence under the theory of respondeat superior. For the reasons stated below, the Court finds that Defendant Werner is entitled to qualified immunity from Plaintiff's § 1983 suit, and that Defendants Werner and Freehold Borough are immune from state law tort liability under the New Jersey Tort Claims Act. Accordingly, summary judgment in favor of Defendants is granted and the Complaint is dismissed.

## I. FACTUAL BACKGROUND & PROCEDURAL HISTORY

### A.  Family Background

Plaintiff Romonda Hickman is the owner of the residence located at 37 Avenue A in Freehold, New Jersey, and has lived at the residence since 2002. Defendants' Statement of Material Fact ("DSMF"), ¶5. Plaintiff's residence is a two-level house with the garage and basement on the lower level and living quarters on the upper level. *Id.* at ¶ 18. Plaintiff's home rests on a natural rise in the land, with the foundation of the house, which is set back from the street from which it is separated by a grass lawn, standing several feet above street level. *Id.* at ¶ 19. Given the elevation of Plaintiff's house, Plaintiff's lawn, rises at a fairly steep angle from its lowest point at street level, to its highest point at the foundation of Plaintiff's home. *Ibid.* The second floor living quarters of Plaintiff's home are accessible through a second-floor front door, which opens onto an elevated deck. The deck in turn is connected to Plaintiff's lawn and driveway by a one-story staircase. *Ibid.*

Plaintiff's adult daughter, Shaquanda Hickman ("Shaquanda")[1], and Shaquanda's boyfriend, Derrick Crenshaw ("Derrick"), began living together with Plaintiff at 37 Avenue A some time in or around 2007, shortly before the birth of Shaquanda and Derrick's first child. DSMF, ¶¶ 1, 3, 4, 6, 7. Shaquanda and Derrick moved out of Plaintiff's home for some period between 2007 and 2012, but returned to live with Plaintiff permanently in March 2012, shortly after the birth of Derrick and Shaquanda's second child. *Id.* at ¶ 7. Shaquanda and Derrick were living at Plaintiff's home at the time of the incident in question in September 2014.

---

[1] Due to the shared surnames of many of the persons involved in this case, the Court identifies them by given names.

Plaintiff and Shaquanda had a "strained and difficult" or "love/hate" relationship, extending back to Shaquanda's teenage years, when Shaquanda believed that Plaintiff favored Shaquanda's brother over her. DSMF, ¶¶ 8, 9, 11, 12. This relationship became particularly strained after Shaquanda moved back into Plaintiff's home with her family in March 2012.

Derrick Crenshaw was incarcerated from April 2013 to February 2014 in Ocean County Jail on a second degree robbery conviction involving a weapon. *Id.* at ¶13. The relationship between Plaintiff and Shaquanda deteriorated further when Derrick was released from prison and began to live with Plaintiff and Shaquanda. *Id.* at ¶ 14. Plaintiff objected to Derrick living in her home since he was not employed, was not helping around the house, and generally remained idle. *Id.* at ¶ 15. In the summer of 2014, Plaintiff went to court to evict Shaquanda and Derrick from her house. *Id.* at ¶ 16. A New Jersey state court entered an order, dated July 24, 2014, compelling Shaquanda and Derrick to vacate Plaintiff's residence by October 1, 2014. *Id.* at ¶ 17.

**B.  Pre-Incident Events**

On September 23, 2014, at 7:00 a.m., Plaintiff arrived home from her work at the United States Post Office, where she had worked from ten o'clock the previous evening until 6:30 a.m. that morning. *Id.* at ¶ 29. Upon arriving home, Plaintiff went downstairs to do her laundry and discovered that the Derrick's clothes were already in the washing machine. *Id.* at ¶ 30. Plaintiff was upset that the clothes had been left in the washing machine and went to the bedroom where Shaquanda and Derrick were sleeping. *Id.* at ¶ 31. The three began to argue. *Ibid.* Plaintiff, Shaquanda, and Derrick moved into the living room and continued to argue. *Id.* at ¶ 32. The argument between Plaintiff and Shaquanda became physical when Plaintiff hit Shaquanda and Shaquanda retaliated by hitting Plaintiff. *Id.* at ¶ 33. Derrick positioned himself between Plaintiff and Shaquanda in an attempt to stop the fight, at which point Plaintiff grabbed a broom with

which to hit Shaquanda. *Id.* at ¶ 34. Derrick took the broom from Plaintiff and tossed it to one side. *Id.* at ¶ 35.

Plaintiff then called 911 to request assistance in getting Shaquanda and Derrick out of her house. *Id.* at ¶ 36. Plaintiff reported to the 911 operator that there was fighting going on with her daughter and that there was property damage as a result. *Id.* at ¶ 37. After she hung up with the 911 operator, Plaintiff called her mother, Beulah Hickman ("Beulah"), to request that Beulah come to Plaintiff's house and remove Shaquanda. *Id.* at ¶ 38. Plaintiff also told her mother, Beulah, that she and Shaquanda were fighting and that Shaquanda was breaking things in the house. *Ibid.* While Plaintiff was waiting for the police to arrive, she continued to argue with Shaquanda, but they were no longer "throwing punches." *Id.* at ¶ 39. Derrick took his and Shaquanda's two children, who were approximately ages one and five, out of the house and placed them in his car, which was parked outside on the street. *Id.* at ¶ 40.

While these events were transpiring at 37 Avenue A, on September 23, 2014, Patrolman Sean Healey, an officer in the Freehold Borough Police Department, was working a road construction job approximately 500 feet from Plaintiff's residence. *Id.* at ¶ 41. At approximately 7:20 a.m., Freehold's police dispatch broadcasted a call that there was a fight in progress at 37 Avenue A. Patrolman Healey heard the call, and, because Patrolman Healey was close to the Plaintiff's residence and the construction project had not yet started, Patrolman Healy responded to the call. *Id.* at ¶ 42. Since Patrolman Healey was working an extra duty assignment, the vehicle he was operating was not equipped with a Mobile Video Recording device ("MVR"). *Id.* at ¶ 43.

Patrolman Diego Flores, an officer in the Freehold Borough Police Department, was assigned to patrol on the 7:00 a.m. to 3:30 p.m. shift. Patrolman Flores was in police

headquarters when he received the call from dispatch of a fight in progress. He operated a marked patrol vehicle, which was equipped with an MVR, and proceeded to the location. At approximately 7:24:35 a.m., he parked his vehicle behind the vehicle operated by Patrolman Healey and on the same side of the street as 37 Avenue A. *Id.* at ¶ 44. Patrolman Flores' MVR is one of the two video-recordings of the incident at issue in this case upon which the Court relies. Patrolman Flores' MVR did not record any sound, but had a direct view of the area of Plaintiff's front yard, where the incident occurred.

Patrolman Kevin Werner, an officer in the Freehold Borough Police Department and the individual Defendant in this case, was also assigned to patrol on the 7:00 a.m. to 3:30 p.m. shift. Patrolman Werner was in police headquarters when he received the call from dispatch. He operated a marked patrol vehicle, which was equipped with an MVR, and proceeded to the location. At approximately 7:24:49 a.m., Patrolman Werner arrived on scene and parked his vehicle behind Patrolman Flores' vehicle. *Id.* at ¶ 45. Patrolman Werner's MVR captured both video and audio recordings of the entire incident in question, and is the other video recording upon which this Court relies. The fourth officer to arrive at the scene was Sergeant Colaner, the Shift Supervisor. DSMF at ¶ 46.

Upon Patrolman Healey's arrival, he saw Plaintiff throwing clothing and personal belongings from the house onto the front lawn. Shaquanda was picking up the items and yelling at her mother from the front lawn. Derrick was on the front lawn close to the driveway and was not engaged in the argument. *Id.* at ¶ 47. Since the matter was a domestic violence incident, Patrolman Healey brought Plaintiff inside the home in order to separate the parties, leaving Shaquanda and Derrick outside, before any other officers arrived. *Id.* at ¶ 48. Once inside with

Plaintiff, Patrolman Healey locked the front door behind him to ensure that the parties would remain separated. Patrolman Healey began interviewing Plaintiff Romonda Hickman. *Id.* at ¶ 49.

Upon the arrival of Patrolman Flores, he observed Shaquanda Hickman and Derrick Crenshaw outside the home. Patrolman Flores spoke to Shaquanda and Derrick, who were both upset, concerning the events which led to the call for police assistance. *Id.* at ¶ 50. Upon his arrival, Patrolman Werner also spoke to Derrick and Shaquanda outside of Plaintiff's house, on the steps near the driveway. *Id.* at ¶ 51.

At approximately 7:25:37 a.m., Derrick stated to Officers Werner and Flores that Plaintiff hit Shaquanda with a broomstick, and Derrick suggested that Plaintiff should be charged. *Id.* at ¶ 52. At approximately 7:26:48 a.m., due to Patrolman Werner's presence on the scene, Patrolman Flores knocked on the front door, and was admitted to the residence by Patrolman Healey to assist in the interview of Plaintiff. *Id.* at ¶ 53.

At approximately 7:26:50 a.m., Patrolman Werner remained outside and interviewed Shaquanda to determine the events leading up to the call for assistance. Shaquanda stated Plaintiff was upset that Derrick's laundry was in the washing machine, that they started to argue, curse and yell, and that the argument became physical as Plaintiff hit her with a broomstick. *Id.* at ¶ 54. Shaquanda advised further that Plaintiff wanted Shaquanda and her boyfriend out of the house immediately. Shaquanda advised that an order had already been entered compelling them to vacate the premises on a future date. *Id.* at ¶ 55. At approximately 7:29:03 a.m., Patrolman Werner replied that "this is all over laundry?" *Id.* at ¶ 56. At approximately 7:29:17 a.m., Sergeant Colaner, who likewise remained outside the residence, spoke with Derrick to obtain information. Derrick confirmed Shaquanda's statement that Plaintiff "went crazy," struck Shaquanda with a broomstick, and was "out of control." *Id.* at ¶57.

While Patrolman Healey and Patrolman Flores were interviewing Plaintiff inside the home, she was very upset, yelling that she did not want Derrick and Shaquanda staying in her house any longer. DSMF, ¶ 58. Plaintiff advised Patrolman Healey and Patrolman Flores that she had a Court Order for Shaquanda and Derrick to vacate the premises on October 1, 2014, but she did not want to wait that long. *Id.* at ¶ 59. While she was being interviewed inside the house, Plaintiff explained to Patrolman Healey and Patrolman Flores that she came home from work to do her laundry and found Derrick's clothes in the washing machine. She then confronted Shaquanda about the clothes. Plaintiff explained that she became very upset because she works many hours and wanted to do her laundry. *Id.* at ¶ 60. Inside the home, Patrolman Flores observed clothes thrown about the floor, two bags of clothes were near the door and a broken picture frame was on the floor. Patrolman Flores asked Plaintiff if there had been an altercation between her and Shaquanda which got physical, and Plaintiff acknowledged that fact. However, Patrolman Flores and Patrolman Healey did not observe any injuries on Plaintiff and she reported no injury. *Id.* at ¶ 61.

At approximately 7:29:32 a.m., a vehicle operated by Lafonda Bagby ("Lafonda"), Plaintiff's sister, pulled into the driveway of Plaintiff's home. In addition to Lafonda Bagby, the vehicle was occupied by Beulah Hickman, Plaintiff's mother, and Anthony Daniels ("Anthony"), Lafonda's boyfriend. *Id.* at ¶ 62. At approximately 7:29:38 a.m., all occupants exited the vehicle. Lafonda immediately started yelling at Shaquanda and Derrick that they must leave. Lafonda then moved toward the house. Sergeant Colaner advised her that no one would be allowed inside, as an investigation was ongoing. Nevertheless, Lafonda continued to state that she was going inside the home. *Id.* at ¶ 63.

Shaquanda told Lafonda, Beulah, and Anthony that they could go home and asked Patrolman Werner and Sergeant Colaner to tell them to go home. *Id.* at ¶ 64. At approximately 7:29:48 a.m., Lafonda stated, "We're not going home 'cause you guys are getting out." *Id.* at ¶ 65. Lafonda then ran around the base of the steps, where Sergeant Colaner was standing and onto the front lawn, rushing towards Shaquanda in an aggressive and confrontational manner. *Id.* at ¶ 66. At approximately 7:29:50 a.m., Lafonda and Shaquanda began to yell at each other and Shaquanda lunged at Lafonda, as both women waved their arms wildly in an attempt to hit one another, resulting in another physical confrontation. *Id.* at ¶ 67. Plaintiff admits only that Shaquanda lunged at Lafonda, but the MVR clearly shows Lafonda and Shaquanda yelling at one another and attempting to strike one another with flailing arms. MVR, 7:29:51.

Patrolman Werner took hold of Shaquanda and Sergeant Colaner took hold of Lafonda in order to separate the women and stop their fighting. DSMF, ¶ 68. Sergeant Colaner moved Lafonda down the steep front lawn towards the street away from Patrolman Werner and Shaquanda. *Id.* at ¶ 69. Shaquanda continually made attempts to pull away from the control of Patrolman Werner, which resulted in Patrolman Werner directing Shaquanda to "stay back" and "stay here." *Id.* at ¶ 70. During this time, Beulah, continued to yell at Shaquanda. *Id.* at ¶ 71.

While Patrolman Healey and Patrolman Flores were interviewing Plaintiff inside the home, they heard loud voices outside. *Id.* at ¶ 72. Plaintiff also heard voices from outside the home while she was inside the house. *Id.* at ¶ 73.

Sergeant Colaner held Plaintiff's sister, Lafonda, near the street while Lafonda's boyfriend, Anthony Daniels, who had been standing near the car in which he arrived, started walking towards Sergeant Colaner. *Id.* at ¶ 74. When Anthony Daniels came within three feet of Sergeant Colaner and Lafonda, whom Sergeant Colaner was still restraining, Sergeant Colaner

removed his O.C. pepper spray canister and ordered Anthony to step back several times. *Id.* at ¶ 75.

At approximately 7:29:56 a.m., Sergeant Colaner broadcast the message "Outside" over his radio, which message was heard by all of the Officers on the scene. *Id.* at ¶ 76. At approximately 7:30:00 a.m., Patrolman Flores exited Plaintiff's house, went down the front steps, ran past Shaquanda, who was still being held by Patrolman Werner at the bottom of the steps, and down the front lawn towards Sergeant Colaner's position. *Id.* at ¶ 77. Patrolman Flores heard Sergeant Colaner order Anthony Daniels to get back on a number of occasions and also saw Sergeant Colaner point his O.C. spray at Anthony while holding onto Lafonda. *Id.* at ¶ 78. Patrolman Flores positioned himself between Sergeant Colaner and Anthony and directed Anthony back to the driveway. *Id.* at ¶ 79. Anthony complied with Patrolman Flores' instructions. *Id.* at ¶ 80. Anthony was then told to wait in his vehicle and he walked into the driveway, ultimately standing in the driveway behind the vehicle in which he, Lafonda, and Beulah had arrived. *Id.* at ¶ 81.

At approximately 7:30:02 a.m., Plaintiff ran out of the house directly behind Patrolman Flores, and proceeded down the steps. *Id.* at ¶ 82. When Plaintiff ran out of her house, she was wearing socks, but no shoes. *Id.* at ¶ 83. Also at approximately 7:30:02 a.m., Patrolman Healey exited the home directly behind Plaintiff. *Id.* at ¶ 84.

## C.  The Incident

Although the parties agree as to the forgoing facts, except as specifically noted, their narratives diverge at the point that Plaintiff ran out of her house. The events of the next few minutes, however, were captured on the MVRs of Patrolman Flores and Patrolman Werner. The Court therefore sets forth the parties' versions of events, but relies for the purposes of

adjudicating Defendants' motion for summary judgment on the sequence of events clearly recorded in the MVRs.[2]

### 1. Plaintiff's Version of Events

Plaintiff contends that after running out the front door, she went down her steps in order to stop her daughter from hitting her mother. Plaintiff contends that she saw that Shaquanda was moving toward Plaintiff's mother, Beulah, and looked as if she was going to hit Plaintiff's mother, so Plaintiff moved in between Shaquanda and Beulah. Plaintiff contends that she was not moving aggressively toward Shaquanda, only positioning herself in between Shaquanda and Beulah. Plaintiff further testified in her deposition that as soon as she had moved in between Shaquanda and Beulah, Patrolman Werner moved around her and tackled her. Specifically, Plaintiff testified that "he went around me and grabbed me and I felt like a tackle. That's what it felt like." Plaintiff's Supplemental Statement of Disputed Material Facts ("PSSDMF"), ¶ 2. Plaintiff claims the point at which she was "tackled" is reflected on the MVR footage at 7:30:05 a.m. *Id.* at ¶ 5.

In support of her account, Plaintiff offers the testimony of Anthony Daniels, who arrived on the scene at 7:29:32 a.m. in the car driven by Lafonda, and observed the incident from Plaintiff's driveway. Anthony testified at his deposition that Patrolmen Werner "tackled" Plaintiff. Specifically, Anthony stated that "He [Patrolman Werner] -- like he forced himself on top of her like almost like a tackle position, but he grabbed her and they both came off their feet and he landed on top of her." PSSDMF, ¶ 21. "It wasn't exactly a bear hug. It was almost like a

---

[2] *See, e.g.*, *Knight v. Walton*, 660 F. App'x 110, 112 (3d Cir. 2016) (quoting *Scott v. Harris*, 550 U.S. 372, 380–81) ("Where there is a video recording of the relevant events, the Court views the facts as depicted in the recording, rather than in the non-movant's favor, whenever the recording 'blatantly contradict[s]' the non-movant's version such that 'no reasonable jury could believe it.'"). See also, the Court's discussion of *Scott v. Harris* in the Standard of Review.

tackle. Not her upper body, her lower waist." *Ibid.* "I don't know if he slipped or not. It looked like to me he grabbed her and intentionally to bring her to the ground." *Ibid.* Plaintiff also offers the testimony of Lafonda, who was shown the MVR footage during her deposition and stated that Patrolman Werner tackled Plaintiff from behind "like a football player." *Id.* at ¶ 27. Plaintiff also offers the testimony of Beulah, who was shown the MVR footage during her deposition and stated that Patrolman Werner threw Plaintiff on the ground and sat on her, that he tackled her "like she was playing football." *Id.* at ¶ 37. Finally, Plaintiff also offers the testimony of Michael Blacknall, another witness who claims to have been near the scene at the time of the incident. Michael stated that Patrolman Werner executed what "looked like a football tackle" on Plaintiff. *Id.* at ¶ 39.

### 2. Defendants' Version of Events

Defendants contend that after running out the front door of her home, Plaintiff ran down the steps at "full speed" DSMF, ¶ 85. At approximately 7:30:03 a.m., Patrolman Healy went to assist Patrolman Werner, who was trying to restrain Shaquanda and prevent a physical altercation between Shaquanda and Plaintiff. Shaquanda was advancing towards Plaintiff in an aggressive and threatening manner. *Id.* at ¶ 86. At approximately 7:30:04 a.m., Plaintiff charged at Shaquanda, as Patrolman Werner and Healey were attempting to restrain Shaquanda. Shaquanda was able to free an arm from the officers' grasps and attempted to strike Plaintiff. *Id.* at ¶ 87. Since Plaintiff, who was estimated to weigh over 200 pounds, was charging towards her daughter in a threatening manner, Patrolman Werner assessed that Plaintiff was more threatening and the aggressor. As such, Patrolman Werner released his grasp of Shaquanda, knowing that Patrolman Healey was there to assist with Shaquanda. *Id.* at ¶ 88. Patrolman Healey grabbed

Shaquanda as Shaquanda was forcefully attempting to get around him and continue her attempts to hit Plaintiff. *Id.* at ¶ 89.

Defendants contend that at approximately 7:30:05 a.m., Patrolman Werner "grabbed" Plaintiff to prevent the physical altercation between Plaintiff and Shaquanda from escalating. *Id.* at ¶ 90. As Plaintiff rushed towards Shaquanda in a physical, threatening, and forceful manner, Plaintiff yelled "I am going to fuck you up" at Shaquanda. *Id.* at ¶ 91. At approximately 7:30:06 a.m., after Patrolman Healey had grabbed Shaquanda, he escorted her down the front lawn away from Plaintiff. *Id.* at ¶ 92. At the same time, Plaintiff continued in her attempts to make physical contact with Shaquanda. Plaintiff's attempts to make contact and her momentum from rushing down the hill moved Plaintiff and Patrolman Werner down the hill. Patrolman Werner attempted to prevent Plaintiff from assaulting Shaquanda by moving her away from Shaquanda. *Id.* at ¶ 93. However, at approximately 7:30:07 a.m., Plaintiff's momentum and the slope of the wet lawn[3] caused Patrolman Werner and Plaintiff to slip and land on their backsides with Plaintiff falling on top of Patrolman Werner. *Id.* at ¶ 95. Defendants contend that at approximately 7:30:07 a.m., the MVR tape clearly shows Patrolman Werner's feet and legs moving forward as he slips on the wet, sloped front lawn and Plaintiff falling on top of Patrolman Werner. *Id.* at ¶ 96. Both Plaintiff and Patrolman Werner fell on their buttocks with Plaintiff on top of Patrolman Werner. *Id.* at ¶ 97.

---

[3] Plaintiff and Defendants dispute whether or not the lawn was "damp" at the time of the incident. Defendants contend that the lawn was damp, contributing to its slipperiness, which in turn partially caused Plaintiff and Patrolman Werner's accidental fall. Plaintiff contends, based on her own observations and proffered expert testimony, that the law was not damp. Although the lawn being damp would certainly strengthen Defendants' argument that Plaintiff and Patrolman Werner's slip and fall on Plaintiff's lawn was accidental, this dispute is not material, because the Court relies upon the clear MVR footage showing the fall, rather than the recollections and characterizations of the parties. *Anderson*, 477 U.S. at 248 (disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment).

In support of their version of events, Defendants, in addition to the MVR footage, offer the testimony of eyewitness Derrick Crenshaw. Derrick, who was observing the incident from the street, described the incident between Plaintiff and Patrolman Werner as Plaintiff coming "full speed ahead" down her stairs, and attributed Plaintiff's and Patrolman Werner's fall to the momentum of Plaintiff coming down the stairs and Patrolman Werner restraining Plaintiff. *Id.* at ¶ 101. Derrick testified that Patrolman Werner "could have slipped on the grass or it could have been poor footing." *Id.* at ¶ 102. Plaintiff's front lawn, where Plaintiff and Patrolman Werner fell, was "pretty steep," in Derrick's estimation. *Id.* at ¶ 103. Derrick testified that because Plaintiff's property was located on a hill, any misfooting could result in slipping down the hill. During the incident, Plaintiff got close enough to Shaquanda to rip Shaquanda's shirt, and it was only at that point that Patrolman Werner grabbed Plaintiff. Crenshaw testified that Patrolman Werner did not tackle Plaintiff, only that he grabbed her and then they both fell, due to the slope or misfooting. In short, the fall appeared accidental to Derrick. *Id.* at ¶ 105.

### 3. The MVR Footage

The MVR footage largely, but not completely confirms Defendants' account of the incident.[4] Plaintiff, who was indeed running out of her house and down the stairs, reaches the foot of her front steps at 7:30:03 a.m. At this point, she pauses briefly and recoils as Shaquanda, who as Defendants contend, appears to have gotten an arm free from the officer restraining her, strikes out at Plaintiff. The MVR is thus, at least initially, not inconsistent with Plaintiff's claim that she ran down the stairs in an attempt to interpose herself between Shaquanda and Beulah,

---

[4] Because the Flores MVR provides the superior image of the incident and the Werner MVR provides the only sound, the Court's references to "the MVR" should be understood to mean the composite of the Flores MVR video with the Werner MVR audio. There is no discrepancy in the timestamps of the two MVRs. All references to events in this section reflect events depicted in the MVR footage at the time indicated, unless otherwise noted.

not to attack Shaquanda. The MVR diverges from Plaintiff's account, however, shortly thereafter. At 7:30:04 a.m., after having struck at Plaintiff, Shaquanda is successfully pulled away by Patrolman Werner and Patrolman Healy, who begin walking with her backwards down the slope of Plaintiff's front lawn. Plaintiff, who at this moment is not being restrained by any officers, advances on Shaquanda, down the slope of the front lawn, waving her arm as if to strike Shaquanda.

At 7:30:05 a.m., Plaintiff rushes toward Shaquanda, down the slope of the yard. Patrolman Werner can be seen to release Shaquanda, into the grasp of Patrolman Healy, and then quickly move behind Plaintiff and grab her by wrapping his arms around her upper body.[5] At the same time that Patrolman Werner grabs Plaintiff from behind, Plaintiff yells at Shaquanda "I will fuck you up." MVR, 7:30:05-06.

At 7:30:06 a.m. Patrolman Werner is standing behind Plaintiff with his arms wrapped around her upper body as she visibly strains to advance on Shaquanda, who is still being pulled down the slope of the yard toward the street. At 7:30:07 a.m., Plaintiff is still rushing forward, down the slope of the yard toward Shaquanda and the street, with Patrolman Werner standing behind her trying to restrain her. Suddenly, first Patrolman Werner's and then Plaintiff's feet slip out from under them, shooting forward in the direction of the street. The fall appears clearly accidental in light of the fact that Plaintiff and Patrolman Werner were standing on grass, the area where they were standing was on an incline, Plaintiff was wearing only socks, and Plaintiff

---

[5] It should be noted that only the MVR of Patrolman Flores captures Patrolman Werner grabbing Plaintiff completely. A bush or small tree stood between both Patrolman Flores and Patrolman Werner's cars and the scene of the incident. Patrolman Flores' car was parked closer and to the scene and Patrolman Werner's farther away. Due to their different position, the bush/tree obscures different parts of the scene at a given time for each MVR. Accordingly, from viewing both MVRs, it is possible to get a complete view of the incident.

and Patrolman Werner were moving down the grade of the incline by the force of Plaintiff's momentum at the time they lost their footing.

At 7:30:08 a.m., it is clear that both Plaintiff and Patrolman Werner land on their buttocks, with Patrolman Werner hitting the ground first and Plaintiff following, falling partially on top of Patrolman Werner. At 7:30:09 a.m., still under the force of the momentum from their fall, Plaintiff and Patrolman Werner slide partially down the grade of Plaintiff's lawn, and Patrolman Werner rolls over on top of Plaintiff.

Plaintiff and Patrolman Werner then move about on the ground for period, while Patrolman Werner is visibly kneeling over and attempting to handcuff Plaintiff. MVR, 7:30:10-35. In short, events largely transpired as Defendants contend, except that Plaintiff's rushing down the stairs and rushing toward Shaquanda were not one fluid motion. Instead, Plaintiff ran down the stairs only to pause and pull back under attack by Shaquanda. After Shaquanda was pulled backward, away from Plaintiff, however, Plaintiff began advancing again down the lawn toward Shaquanda and the street. It was only after Plaintiff began her aggressive advance that Patrolman Werner grabbed, not tackled, Plaintiff from behind in an attempt to restrain her, directly contradicting Plaintiff's version of events.

### D. Post-Incident Events

Once the incident itself was over, the parties again largely agree on the facts. After the incident, Patrolman Healey placed Shaquanda in a patrol vehicle in order to remove her from the situation. DSMF, ¶ 108. While Plaintiff remained on the ground, her mother, Beulah attempted to approach Plaintiff and Patrolman Werner in an argumentative manner. Beulah had to be ordered several times by Patrolman Werner to back away from him and Plaintiff. *Id.* at ¶ 120. At

approximately 7:30:35 a.m., after Patrolman Werner and Plaintiff fell, Werner instructed Beulah to step back. Plaintiff then stated to her mother, "Mommy, back up." *Id.* at ¶ 109.

At approximately 7:30:58 a.m., while Plaintiff was on the ground, she stated to Patrolman Werner, "you hurt my wrist too." *Id.* at ¶ 110. At approximately 7:31:03 a.m., Plaintiff stated, "I can't stand up because you broke my fucking ankle." *Id.* at ¶ 111. At approximately 7:31:07 a.m., Plaintiff stated, "You fell on my ankle." Plaintiff again stated at approximately 7:31:11 a.m., "you fell on my ankle." *Id.* at ¶ 112.

At approximately 7:31:14 a.m., when Plaintiff was told she was under arrest, she responds, "Why, why? What did I do?" Patrolman Werner repeated, "You are under arrest." Plaintiff responded, "Why? I'm home." *Id.* at ¶ 113. At approximately 7:31:26 a.m., Plaintiff then stated, "Nobody is going to put their hands on my mother." *Id.* at ¶ 114.

A pair of sneakers were retrieved from the home at Plaintiff's request since she was wearing only socks. *Id.* at ¶ 115. At approximately 7:31:57 a.m., Sergeant Colaner then explained to Plaintiff the events which occurred outside her residence. Sergeant Colaner told Plaintiff, "Lafonda went after your daughter and she was placed under arrest." *Id.* at ¶ 116.

At approximately 7:32:10 a.m., Plaintiff kept telling the officers, "Nobody is going to put their hands on my mother." Sergeant Colaner again stated that Plaintiff's mother was not involved, but that Lafonda attacked Shaquanda, which is why Lafonda was placed under arrest. Sergeant Colaner then stated, "Maybe if you saw what happened you would know what happened, because you got it all wrong." *Id.* at ¶ 117. Plaintiff was handcuffed behind her back as she was charged with obstruction, disorderly conduct and disorderly conduct harassment involving physical contact. *Id.* at ¶ 118. Due to Plaintiff's complaints of ankle pain, an ambulance

was summoned, but Plaintiff refused medical treatment, indicating that a family member would drive her to the hospital for treatment. *Id.* at ¶ 119.

### E. Charges and Guilty Pleas

Plaintiff was charged with obstruction, disorderly conduct and disorderly conduct harassment involving physical contact. Plaintiff was released on her own recognizance so she could have her ankle evaluated. *Id.* at ¶ 121. Lafonda was also handcuffed and transported to headquarters for processing. Lafonda was charged with obstruction, disorderly conduct and disorderly conduct harassment involving physical contact. *Id.* at ¶ 122. Once the situation was calm, Patrolman Healey removed Shaquanda from the patrol vehicle, handcuffed her and placed her in another patrol vehicle for transport to headquarters for processing. *Id.* at ¶ 123. Shaquanda was likewise charged with obstruction, disorderly conduct, and disorderly conduct harassment involving physical contact. *Id.* at ¶ 124.

On March 3, 2015, following a plea, the charges filed against Shaquanda, Lafonda, and Plaintiff for disorderly conduct harassment were dismissed. *Id.* at ¶ 125. The charges of disorderly conduct and obstruction were amended to violations of Borough Ordinance 9.04.05, disorderly conduct. Shaquanda, Lafonda, and Plaintiff pled guilty to violating the aforementioned Borough ordinance. *Id.* at ¶ 126.

### F. Procedural History

On or about October 29, 2014, Plaintiff Romonda Hickman, through her attorney, filed a Notice of Tort Claim as a result of the September 23, 2014 incident. On May 27, 2015, Plaintiff filed a seven-count Complaint in this Court naming Defendants Freehold Borough, Chief Glenn Roberts, and Kevin Werner as Defendants, and alleging excessive force in violation of 42 U.S.C. § 1983 (Count One), failure to intervene in violation of 42 U.S.C. § 1983 (Count Two),

supervisory liability in violation of 42 U.S. C. § 1983 (Count Three), *Monell* and failure to train claims in violation of 42 U.S.C. § 1983 (Count Four), excessive force in violation of the New Jersey Civil Rights Act (Count Five), state law claims of assault and battery (Count Six), and state law claims of negligence (Count Seven). As reflected in the Notice of Tort Claim, the claims arise out of the incident that occurred on September 23, 2014.

On June 12, 2015, an Answer to the Complaint was filed by William T. Connell, Esq. on behalf of Defendants Freehold Borough and Chief Roberts. On June 12, 2013, an Answer to the Complaint was filed by Michael John Stone, Esq. on behalf of Patrolman Kevin Werner.

By way of Order dated June 20, 2016, the claims of failure to intervene (Count Two), supervisory liability (Count Three), *Monell*, and failure to train (Count Four) were voluntarily dismissed with prejudice. (See Document Number 18.) The only claims remaining that are before this Court on the present motions are excessive force in violation of § 1983 and the New Jersey Civil Rights Act (Counts One and Five, raised against Defendant Werner only), assault and battery (Count Six, raised against Defendants Werner and Freehold Borough) and negligence (Count Seven, raised against Defendants Werner and Freehold Borough). Therefore, all claims against Chief Roberts have been voluntarily dismissed with prejudice. The state law claims of assault and battery and negligence which remain against the Borough of Freehold are based on the theory of respondeat superior.

## II. STANDARD OF REVIEW

Summary judgment is appropriate where the Court is satisfied that "there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." *Fed. R. Civ. P.* 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). A factual dispute is genuine only if there is "a sufficient evidentiary basis on which a reasonable jury could find for

the non-moving party," and it is material only if it has the ability to "affect the outcome of the suit under governing law." *Kaucher v. County of Bucks,* 455 F.3d 418, 423 (3d Cir. 2006); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Anderson,* 477 U.S. at 248. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor .'" *Marino v. Indus. Crating Co.,* 358 F.3d 241, 247 (3d Cir. 2004) (*quoting Anderson,* 447 U.S. at 255)); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *Curley v. Klem,* 298 F.3d 271, 276–77 (3d Cir. 2002).

In *Scott v. Harris,* 550 U.S. 372, 378 (2007), however, the Supreme Court noted that the existence in the record of a videotape capturing the events underlying an excessive force claim presents an "added wrinkle" to the usual standard which requires courts "to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Id.* (citations omitted). The Court instructed that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for the purposes of ruling on a motion for summary judgment." *Scott,* 550 U.S. at 380. Under such circumstances, the Supreme Court held, a court should view "the facts in the light depicted by the videotape." *Id.* at 380–81. *See also Knight v. Walton*, 660 F. App'x 110, 112 (3d Cir. 2016) (quoting *Scott v. Harris*, 550 U.S. 372, 380–81) ("Where there is a video recording of the relevant events, the Court views the facts as depicted in the recording, rather than in the non-movant's favor, whenever the recording 'blatantly contradict[s]' the non-movant's version such

that 'no reasonable jury could believe it.'"); *Smith v. Price*, 610 F. App'x 113, 115 (3d Cir. 2015)

(quoting *Scott v. Harris,* 550 U.S. 372, 380 (2007)) ("where there are video recordings of the

incidents in question, [courts] need not adopt the non-movant's version of the facts if the

recordings 'blatantly contradict[ ]' the non-movant's version 'so that no reasonable jury could

believe it.'") (quoting *Scott v. Harris*, 550 U.S. 372, 380–81).

   The burden of establishing that no "genuine issue" exists is on the party moving for

summary judgment. *Celotex,* 477 U.S. at 330. "A nonmoving party has created a genuine issue of

material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."

*Gleason v. Norwest Mortg., Inc.,* 243 F.3d 130, 138 (3d Cir. 2001). The non-moving party must

present "more than a scintilla of evidence showing that there is a genuine issue for trial."

*Woloszyn v. County of Lawrence,* 396 F.3d 314, 319 (3d Cir. 2005) (quotations omitted). Under

*Anderson,* plaintiffs' proffered evidence must be sufficient to meet the substantive evidentiary

standard the jury would have to use at trial. 477 U.S. at 255. To do so, the non-moving party

must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to

interrogatories, and admissions on file, designate specific facts showing that there is a genuine

issue for trial." *Celotex,* 477 U.S. at 324 (quotations omitted); *see also Matsushita,* 475 U.S. at

586; *Ridgewood Bd. of Ed. v. Stokley,* 172 F.3d 238, 252 (3d Cir. 1999). In deciding the merits of

a party's motion for summary judgment, the court's role is not to evaluate the evidence and

decide the truth of the matter, but to determine whether there is a genuine issue for trial.

*Anderson,* 477 U.S. at 249. Credibility determinations are the province of the factfinder. *Big*

*Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir. 1992).

   There can be "no genuine issue as to any material fact," however, if a party fails "to make

a showing sufficient to establish the existence of an element essential to that party's case, and on

which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322–23. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323; *Katz v. Aetna Cas. & Sur. Co.,* 972 F.2d 53, 55 (3d Cir.1992).

## III. QUALIFIED IMMUNITY

"Police officers, embodying the authority of the state, are liable under § 1983 when they violate someone's constitutional rights, unless they are protected by qualified immunity." *Santini v. Fuentes*, 795 F.3d 410, 416–17 (3d Cir. 2015) (quoting *Curley v. Klem*, 499 F.3d 199, 206 (3d Cir. 2007). "The doctrine of qualified immunity shields government officials who perform discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id.* at 417 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). "The purpose of qualified immunity is to 'avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment.'" *Id.*

An "essential attribute [of absolute and qualified immunity is] an entitlement not to stand trial under certain circumstances," and qualified immunity is "an *immunity from suit* rather than a mere defense to liability." *In re Mushroom Direct Purchaser Antitrust Litig.*, 655 F.3d 158, 164 (3d Cir. 2011) (quoting 472 U.S. at 525–26) (alterations in original). Because the individual defendant in this case is a police officer, the Court must consider whether Defendant Werner is entitled to summary judgment on Plaintiff's claims under the protection afforded by qualified immunity, before proceeding to consideration of the other arguments in support of Defendants' motions.

Courts in the Third Circuit perform a two-step inquiry to determine whether a particular government official is entitled to summary judgment based on qualified immunity. "First, we ask whether the facts—taken in the light most favorable to the nonmoving party—show that a government official violated a constitutional right." *Santini*, 795 F.3d at 417 (quoting *Saucier v. Katz,* 533 U.S. 194, 201 (2001)). Second, we ask whether that right was clearly established at the time of the official's actions. *Id.* This two-step process "has more particularized requirements in an excessive force case such as this one." *Id.*

In excessive force cases, courts in the Third Circuit determine whether a constitutional violation has occurred using the Fourth Amendment's objective reasonableness test as set forth in *Graham v. Connor,* 490 U.S. 386, 395 (1989). *See Curley,* 499 F.3d at 206–07. To determine objective reasonableness, courts must balance the "nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham,* 490 U.S. at 396, 109 S. Ct. 1865 (quoting *Tennessee v. Garner,* 471 U.S. 1, 8, 105 S. Ct. 1694, 85 L.Ed.2d 1 (1985)) (internal quotation marks omitted). While this inquiry is "highly individualized and fact specific," the Supreme Court has provided three factors to guide courts through it:

(1) the severity of the crime at issue,
(2) whether the suspect poses an imminent threat to the safety of the police or others in the vicinity, and
(3) whether the suspect attempts to resist arrest or flee the scene.

*Santini*, 795 F.3d at 417 (quoting *Graham,* 490 U.S. at 396). *See also Sharrar v. Felsing,* 128 F.3d 810, 822 (3d Cir. 1997) (providing additional factors including "the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the

suspect may be armed, and the number of persons with whom the police officers must contend at one time").

Furthermore, "objective reasonableness" is evaluated "from the perspective of the officer at the time of the incident and not with the benefit of hindsight." *Santini*, 795 F.3d at 417 (citing *Maryland v. Garrison,* 480 U.S. 79, 85 (1987)). The Third Circuit has summarized this standard, evaluating all of the *Graham* factors and additional *Sharrar* considerations, as employing a "totality of the circumstances" approach for evaluating objective reasonableness. *Id.* (citing *Curley,* 499 F.3d at 207).

During the second step of the qualified immunity inquiry, courts ask whether "even though an officer violated an individual's constitutional right—immunity should still protect that officer from liability." *Id.* To answer that question, courts must determine "whether the right violated by the officer was clearly established at the time of the violation." *Id.* (citing *Saucier,* 533 U.S. at 202). To make that determination, courts engage in another reasonableness inquiry: "'whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Id.* (quoting *Saucier,* 533 U.S. at 202). "Like the reasonableness inquiry conducted in step one, this inquiry is objective and fact specific." *Id.* "[T]he step two inquiry is distinct from the inquiry conducted in step one." *Id.* at 418 (citing *Saucier*, 533 U.S. at 205). "*Saucier* highlighted this distinction by noting that the purpose of the step two inquiry is to acknowledge the reality that 'reasonable mistakes can be made as to the legal constraints on particular police conduct.'" *Id.*[6] (quoting *Curley,* 499 F.3d at 207). As the Third Circuit concluded in *Curley,*

---

[6] *See Santini v. Fuentes*, 795 F.3d 410, 418 (3d Cir. 2015) ("*Saucier* mandated that its two-step inquiry be performed in sequential order, *Saucier,* 533 U.S. at 201, which created 'perplexing logical and practical' issues for the lower courts, *Curley,* 499 F.3d at 208. The Supreme Court

> [T]he first step of the analysis addresses whether the force used by the officer was excessive, and therefore violative of the plaintiff's constitutional rights, or whether it was reasonable in light of the facts and circumstances available to the officer at the time. This is not a question of immunity at all, but is instead the underlying question of whether there is even a wrong to be addressed in an analysis of immunity. The second step is the immunity analysis and addresses whether, if there was a wrong, such as the use of excessive force, the officer made a reasonable mistake about the legal constraints on his actions and should ... be protected against suit[.]

*Curley,* 499 F.3d at 207.[7] Applying these principles, the Court evaluates the qualified immunity of Officer Werner.

### A. Step One:

At the most basic level, "[t]o state a claim for excessive force as an unreasonable seizure under the Fourth Amendment, a plaintiff must show that a 'seizure' occurred" *Kopec v. Tate*, 361 F.3d 772, 776 (3d Cir. 2004) (quoting *Estate of Smith v. Marasco,* 318 F.3d 497, 515 (3d Cir. 2003)). Here, the parties do not dispute that Plaintiff's arrest by Officer Werner on September 23, 2014, was a "seizure" of her person within the meaning of the Fourth Amendment, and so the only issue in the first step of the qualified immunity analysis is whether Officer Werner violated Plaintiff's constitutional rights by using force to effect that seizure that was not objectively reasonable.

As a threshold matter, the Court must determine of what "force" Patrolman Werner actually used. Plaintiff contends that Patrolman Werner "tackled" her prior to her arrest, thereby

---

remedied those issues in *Pearson v. Callahan,* 555 U.S. 223, 236 (2009). After Pearson, district and appellate courts have discretion to perform the *Saucier* inquiry in the order we deem most appropriate for the particular case before us.").

[7] The Third Circuit has also cautioned that "'reasonableness under the Fourth Amendment should frequently remain a question for the jury,' however, 'defendants can still win on summary judgment if the district court concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable under the circumstances," as evaluated under the standard set forth above. *Kopec*, 361 F.3d at 777 (quoting *Abraham v. Raso*, 183 F.3d 279, 290 (3d Cir. 1999) (internal citations omitted).

including both Patrolman Werner's grabbing of Plaintiff, and the subsequent fall to the ground in Patrolman Werner's use of force. As discussed above, the Court, relying upon the clear record of the MVR, disagrees. Patrolman Werner merely grabbed Plaintiff from behind in an attempt to restrain her. Patrolman Werner and Plaintiff's subsequent fall to the ground was caused by Plaintiff's forward momentum, and the conditions of Plaintiff's lawn. In any case, review of the *Graham* and *Sharrar* factors reveals that Patrolman Werner's conduct in attempting to restrain Plaintiff, even if contributing to the subsequent fall, was objectively reasonable, given the circumstances.

### 1. Seriousness of the Crime

Plaintiff pled guilty to a violation of Borough Ordinance 9.04.05, for disorderly conduct. The "crime" involved in this incident was thus not of a very serious nature and did not warrant the use of substantial force. That said, as described above, the force Patrolman Werner actually used in this case was not substantial in nature. Patrolman Werner merely grabbed Plaintiff from behind in an attempt to restrain her from inflicting harm on Shaquanda and from suffering harm at the hands of Shaquanda. As evidenced by the MVR recordings, Plaintiff and Patrolman Werner's subsequent fall to the ground was clearly the result of Plaintiff's own momentum carrying the two of them forward down the slope of her front yard.

### 2. Threat to Safety

A reasonable officer in Patrolman Werner's position would conclude that Plaintiff posed a threat to the safety of Shaquanda and, incidentally, the other officers on the scene. Firstly, Plaintiff and Shaquanda had come to blows only seconds before. The MVR footage clearly shows Shaquanda striking at Plaintiff and Plaintiff waving her arm at Shaquanda as Shaquanda is pulled backward away from Plaintiff at 7:30:04 a.m. It was reasonable for Patrolman Werner to

conclude, just one second later at 7:30:05 a.m., that unless Plaintiff were restrained, fighting would resume. Secondly, Plaintiff was aggressively moving toward Shaquanda and Patrolman Healy, who was restraining Shaquanda, at the time Patrolman Werner grabbed Plaintiff. MVR, 7:30:05-06. It had been clear since 7:30:04 a.m. that Patrolman Healy was pulling Shaquanda backward, down the front lawn, toward the street and away from Plaintiff. Plaintiff, who was initially not restrained by any officer, voluntarily chose to pursue Shaquanda down the slope of the yard and was still doing so at the time she was grabbed. *Id.* at 7:30:04-05. It was reasonable for Patrolman Werner to infer an aggressive intent from Plaintiff's movement down the yard toward Shaquanda. Third and finally, at or shortly before the point at which Patrolman Werner grabbed her, Plaintiff began to verbally threaten Shaquanda by saying "I am going to fuck you up." *Id.* at 7:30:05-06. Plaintiff finished speaking her threat, even as Patrolman Werner grabbed her. *Ibid*. It was thus reasonable for Patrolman Werner to conclude that Plaintiff posed a threat to Shaquanda, as Plaintiff had verbally stated her intention to do Shaquanda harm.

### 3. Fleeing or Resisting Arrest

Plaintiff was not fleeing or resisting arrest. Any suggestion by Defendants in briefing that she was doing so are mistaken. The MVR confirms that Plaintiff was already on the ground, pinned under Patrolman Werner when she was informed that she was under arrest. MVR, 7:31:14. Although the MVR shows that Patrolman Werner seems to have had some difficulty in applying the handcuffs to Plaintiff, this appears to have been a result of Plaintiff's positioning on the ground, not due to any active resistance by Plaintiff. *Ibid.* Furthermore, Defendants conceded in discovery that Plaintiff was not fleeing or resisting arrest. PSSDMF, 14.

### 4. *Sharrar* Factors

The *Sharrar* considerations also predominantly support a finding of qualified immunity in this case. A reasonable officer in Patrolman Werner's position could have concluded that Plaintiff had the potential to be violent in the circumstances of this case. In addition to Plaintiff's physical altercation with Shaquanda occurring immediately preceding the restraint, described above, MVR at 7:30:04, Officer Werner had also been told by Shaquanda Hickman just minutes before the incident that Plaintiff had attacked Shaquanda with a broomstick over a dispute about laundry. MVR, 7:26:50; DSMF, ¶ 54. The duration of the action was very short, lasting just 5 seconds from the time Plaintiff reached the foot of her front stairs to the time that Plaintiff was on the ground being pinned by Patrolman Werner. Patrolman Werner was called upon to make a snap decision to prevent harm to those on the scene. *See Brown v. Makofka*, 644 F. App'x 139, 142–43 (3d Cir. 2016) (quoting *Graham,* 490 U.S. at 396-97) ("'[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment.' As the Supreme Court has recognized, 'police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'"). Moreover, the action did take place in the context of effecting an arrest, although it initially began as only out of necessity to prevent imminent harm. There was no reasonable possibility that Plaintiff was armed.

The final, *Sharrar* consideration weighs most strongly in favor of a finding of objective reasonableness in this case. Although there were four officers responding to the scene of Plaintiff's domestic violence complaint, there were at least six other individuals on scene participating to various degrees in the incident. At the time Patrolman Werner decided to restrain Plaintiff, Shaquanda was actively struggling against Patrolmen Healy and Werner and attempting

to attack Plaintiff; Lafonda was being restrained by Sergeant Colaner at the foot of the lawn near the street after having been involved in a physical altercation with Shaquanda just moments before; Beulah Hickman was walking around in close proximity to the officers and Plaintiff, shouting at Shaquanda; Anthony was returning toward his vehicle after a tense moment a minute before in which Patrolman Flores had ordered Anthony back to his car while Sergeant Colaner threatened Anthony with a bottle of O.C. spray; and Derrick was observing the scene from the street. In the crowded and chaotic conditions that prevailed in Plaintiff's yard, it was particularly reasonable for Patrolman Werner to take steps to keep control of the situation. In light of the tense and violent situation, Patrolman Werner's limited use of force was clearly merited.

The Court thus finds, at step one, that Patrolman Werner's use of force — grabbing Plaintiff from behind to restrain Plaintiff from advancing on her daughter — was objectively reasonable and not excessive. The Court thus finds that Patrolman Werner's conduct did not give rise to a violation of Plaintiff's constitutional rights, and concludes that Patrolman Werner is entitled to the protection of qualified immunity. *Santini*, 795 F.3d at 417. Summary judgment in favor of Defendant Werner on Plaintiff's § 1983 excessive force claim is thus granted.

## IV. NJCRA CLAIM

The NJCRA was modeled after § 1983, and thus courts in New Jersey have consistently looked at claims under the NJCRA "through the lens of § 1983." *Trafton v. City of Woodbury,* 799 F.Supp.2d 417, 443–44 (D.N.J.2011); *Chapman v. New Jersey,* Civ. No. 08–4130, 2009 WL 2634888, *3 (D.N.J. Aug. 25, 2009) ("Courts have repeatedly construed the NJCRA in terms nearly identical to its federal counterpart ...."); *Armstrong v. Sherman,* Civ. No. 09–716, 2010 WL 2483911, *5 (D.N.J. June 4, 2010) ("[T]he New Jersey Civil Rights Act is a kind of analog to section 1983 ...."). Accordingly, Plaintiff's New Jersey State Constitution claim will be

interpreted analogously to her § 1983 claim. *Trafton,* 799 F.Supp.2d at 443–44; *see Hedges v. Musco,* 204 F.3d 109, 121 n. 12 (3d Cir. 2000) (concluding New Jersey's constitutional provisions concerning search and seizures are interpreted analogously to the Fourth Amendment). Because the Court has concluded the Patrolman Werner's use of force was objectively reasonable, that there was no violation of Plaintiff's constitutional rights in this case, and that Plaintiff's § 1983 claim fails, Plaintiff's NJCRA claim, also fails. Summary judgment is granted in favor of Patrolman Werner on Plaintiff's claim under the NJCRA.

## V. NJTCA IMMUNITY

### A. Patrolman Werner

Under the New Jersey Tort Claims Act ("NJTCA"), a public employee is generally "liable for injury caused by his act or omission to the same extent as a private person." N.J.S.A. § 59:3-1(a). However, the provisions of the NJTCA immunize from liability public employees who have acted "in good faith in the execution or enforcement of any law." N.J.S.A. § 59:3-3. Specifically, the NJTCA provides that a "public employee *is not liable* if he acts in good faith in the execution or enforcement of any law."[8] N.J.S.A. § 59:3–3 (emphasis added). "In ascertaining whether good faith immunity exists, the New Jersey Supreme Court opined that '[a] public employee either must demonstrate 'objective reasonableness' or that he behaved with 'subjective good faith.'" *Trafton v. City of Woodbury*, 799 F. Supp. 2d 417, 445 (D.N.J. 2011) (quoting

---

[8] The New Jersey Tort Claims Act provides immunity from liability for public employees if they "act[ ] in good faith in the execution or enforcement of any law." N.J. Stat. Ann. 59:3–3. "[T]his Act gives a public official less protection than the right under federal law . . . because it 'provides a government official with immunity from liability, not immunity from suits arising from the performance of official duties.'" *Wheeler v. Jersey City Police Dep't*, No. 16-1869, 2017 WL 244784, at *2 (3d Cir. Jan. 20, 2017) (quoting *Giuffre v. Bissell*, 31 F.3d 1241, 1248 (3d Cir. 1994)). In this case, however, immunity from liability is sufficient to defeat Plaintiff's claims.

*Alston v. City of Camden,* 168 N.J. 170, 773 A.2d 693, 703 (2001)).[9] "The New Jersey Supreme

Court further clarified that '[t]he same standard of objective reasonableness that applies in

Section 1983 actions also governs questions of good faith arising under the Tort Claims Act.'"

*Id.* at 445 (quoting *Wildoner v. Borough of Ramsey,* 162 N.J. 375, 744 A.2d 1146, 1153 (2000)).

*See also Sheppard v. Sheriff*, No. 11-2398 (NLH), 2016 WL 3912845, at *8 (D.N.J. July 19,

2016) (same); *Mantz v. Chain*, 239 F. Supp. 2d 486, 507–08 (D.N.J. 2002) (same). "Therefore, if

the alleged tort and alleged constitutional violation arise out of the same conduct, and the Court

concludes that no constitutional violation occurred because the public employee's actions were

objectively reasonable, the NJTCA's good faith provision applies and bars prosecution of the tort

claim." *Ibid.*

However, the NJTCA strips a public employee of any immunity, if that employee is

found to have engaged in "willful misconduct." N.J.S.A. 59:3-14(a). Specifically, N.J.S.A. §

59:3–14a provides that "[n]othing in this act shall exonerate a public employee from liability if it

is established that his conduct was outside the scope of his employment or constituted a crime,

actual fraud, actual malice or willful misconduct." N.J.S.A. § 59:3–14a. "[W]illful misconduct

requires 'much more' than mere negligence" and "fall[s] somewhere on the continuum between

simple negligence and the intentional infliction of harm." *Alston,* 168 N.J. at 185, 773 A.2d 693

(citation omitted). "[I]n order to recover for injuries allegedly produced by willful and wanton

misconduct, it must appear that the defendant with knowledge of existing conditions, and

conscious from such knowledge that injury will likely or probably result from his conduct, and

with reckless indifference to the consequences, consciously and intentionally does some

---

[9] This defense, however, is unavailable when a public employee is liable for false arrest. *Toto v. Ensuar,* 196 N.J. 134, 952 A.2d 463, 470 (2008)

wrongful act or omits to discharge some duty which produces the injurious result." *Id.* (quoting *McLaughlin v. Rova Farms, Inc.,* 56 N.J. 288, 305, 266 A.2d 284 (1970)). "The New Jersey Supreme Court has recognized that 'good faith' and 'willful misconduct' are 'not necessarily two sides of the same coin' and 'the distinction between the two is a narrow one.' *Whichard v. Willingboro Twp.*, No. CIV.A. 13-3606 JBS, 2015 WL 5054953, at *8 (D.N.J. Aug. 26, 2015) (quoting *Alston,* 168 N.J. at 187, 773 A.2d 693 (quotation omitted)).

In this case, the Court has determined in its consideration of Plaintiff's § 1983 claim, that Patrolman Werner's conduct was objectively reasonable. Patrolman Werner, therefore also did not engage in any willful misconduct in this case. Because Plaintiff's New Jersey state common law assault and battery and negligence tort claims arise from the same alleged conduct as Plaintiff's § 1983 claims, the NJTCA's good faith immunity provision applies to bar Plaintiff's tort claims against Patrolman Werner. Summary judgment in favor of Patrolman Werner is thus entered on the basis of NJTCA immunity from tort liability.

**B. Freehold Borough**

**1. Assault & Battery**

As an initial matter, the New Jersey Tort Claims Act ("NJTCA") provides that "[a] public entity is liable for injury proximately caused by an act or omission of a public employee within the scope of his employment in the same manner and to the same extent as a private individual under like circumstances." N.J. Stat. Ann. § 59:2-2. However, an exception exists for public entities where the act or omission of the employee constitutes "a crime, actual fraud, actual malice, or willful misconduct." N.J. Stat. Ann. § 59:2-10. "Assault and battery are torts that require a showing of intentional or willful misconduct. Therefore, the [municipality] is immune from liability for the assault and battery claims." *Sims v. Tropicana Entm't, Inc.*, No. 13-1981

(RBK/JS), 2016 WL 4801431, at *3 (D.N.J. Sept. 9, 2016) (citing *Merman v. City of Camden*, 824 F. Supp. 2d 581, 597 (D.N.J. 2010)). Accordingly, even had the Court found Patrolman Werner's conduct sufficient to support a claim for the intentional tort of assault and battery, the defendant municipality, Freehold Borough, could not, as a matter of law, be held liable under a theory of respondeat superior.

## 2. Both Assault & Battery and Negligence

The NJTCA does provide for the imposition of respondeat superior on a public entity for "injuries proximately caused by an act or omission of a public employee within the scope of his employment." N.J.S.A. 59:2-2(a). However, the following section of the statute provides that a "public entity is *not liable* for an injury resulting from an act or omission of a public employee where the public employee is *not liable.*" N.J.S.A. 59:2-2(b) (emphasis added). *See Kowalsky v. Long Beach Twp.*, 72 F.3d 385, 392 n.8 (3d Cir. 1995) ("Section 59:2–2b provides: '[a] public entity is not liable for an injury resulting from an act or omission of a public employee where the public employee is not liable.' If the public employee defendants here are not liable, neither are the municipalities."); *see also Ward v. Barnes*, 545 F. Supp. 2d 400, 420 (D.N.J. 2008) (granting summary judgment on negligence claims in favor of public entity because summary judgment granted in favor of the individual defendants); *R.K. v. Y.A.L.E. Sch., Inc.*, 621 F. Supp. 2d 188, 200 n.14 (D.N.J. 2008), *on reconsideration in part*, No. CIV. 07-5918 (JBS), 2009 WL 1066125 (D.N.J. Apr. 20, 2009) (dismissing negligence claims against municipal board because the individual defendants were immune from negligence claims under the NJTCA).

Here, the Court has determined that the individual Defendant Werner is entitled to NJTCA immunity from Plaintiff's state law tort claims. NJTCA immunity is immunity from liability. *Giuffre*, 31 F.3d at 1248. Accordingly, the Court having held that Patrolman Werner is

not liable for assault and battery or common law negligence, it is clear that by action of N.J.S.A.

59:2-2(b), Defendant municipality cannot be liable for such torts under a theory of respondeat

superior. Summary judgment is therefore entered in favor of Freehold Borough on Plaintiff's

state law tort claims on the basis of NJTCA immunity from liability.[10]

## VI. CONCLUSION

  For the foregoing reasons, Defendants' motions for summary judgment are granted.


Dated: _____3/31/2017_____   _____/s/ Freda L. Wolfson_____
                     The Honorable Freda L. Wolfson
                     United States District Judge

---

[10] Because the Court has found NJTCA liability appropriate on other grounds, the Court does not reach Defendants' immunity argument under N.J.S.A. § 59:5–2.